IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| VITRO AMERICA, INC. d/b/a BINSWANGER GLASS | PLAINTIFF |
| **Case No. 07-5150** | |
| vs. | |
| DIXIE CONSTRUCTION, LLC; et al. | DEFENDANTS |
| CAMPBELL ELECTRIC, INC. | COUNTER-CLAIMANT CROSS-CLAIMANT AND THIRD PARTY PLAINTIFF |
| vs. | |
| DIXIE CONSTRUCTION, LLC; et al. | CROSS-DEFENDANTS |
| DIXIE DEVELOPMENT, INC., et al. | THIRD PARTY DEFENDANTS |
| CHAMBERS BANK OF NORTH ARKANSAS | COUNTER-CLAIMANT CROSS-CLAIMANT AND THIRD PARTY PLAINTIFF |
| vs. | |
| VITRO AMERICA, INC. d/b/a BINSWANGER GLASS | COUNTER-DEFENDANT |
| DIXIE MANAGEMENT & INVESTMENT LIMITED PARTNERS; BEN ISRAEL; NANCY ISRAEL; PRIME PROPERTY INVESTMENTS, LLC; NEXT CHAPTER RESOURCES, LLC; COMMERCE PARK II, LLC; JOHN P. MARINONI AND ELIZABETH F. MARINONI, CO-TRUSTEES OF THE ELIZABETH F. MARINONI 2006 REVOCABLE TRUST AGREEMENT u/t/d/ JUNE 2, 2006; JOHN P. MARINONI AND ELIZABETH F. MARINONI, CO-TRUSTEES OF THE JOHN P. MARINONI 2006 REVOCABLE TRUST AGREEMENT u/t/d JUNE 2, 2006; TOM MUCCIO; CAMPBELL ELECTRIC, INC.; FLYNT & SON HARDWOOD, INC.; JOHNSON MECHANICAL CONTRACTORS, INC.; KITCHEN DISTRIBUTORS, INC.; and BUILT-WELL CONSTRUCTION COMPANY | CROSS-DEFENDANTS |

(continued on next page)

BRIEF IN SUPPORT OF CHAMBERS BANK OF NORTH ARKANSAS'S MOTION FOR SUMMARY JUDGMENT AGAINST LIEN CLAIMANTS – Page 1 of 33

CHAMBERS BANK OF NORTH ARKANSAS

vs.

THE BENNY BERT ISRAEL REVOCABLE TRUST,
u/t/d JUNE 17, 1997; THE NANCY KAYE ISRAEL
REVOCABLE TRUST, u/t/d JUNE 17, 1997; NANCY S.
MUCCIO; THE MUCCIO JOINT REVOCABLE
TRUST, u/t/d AUGUST 25, 1999; THOMAS FATH;
NORIKO FATH; THOMAS R. RHYNE; JOANNE W.
RHYNE; DAVID TRZECIAK; TAMARA TRZECIAK;
THREEJACK, LLC; DON MOBLEY; CLAUDIA
MOBLEY; M AND R INVESTMENTS, LLC;
CONCRETE SERVICES OF NORTHWEST
ARKANSAS, INC.; DAVID OLAND, d/b/a DAVID
OLAND WOODWORKING; DUNK FIRE &
SECURITY, INC.; DON MOBLEY, d/b/a MOBLEY
ARCHITECTS, INC.; STONE PANELS, INC.;
NATIONAL HOME CENTERS, INC.; OTIS
ELEVATOR COMPANY; HUTCHENS
CONSTRUCTION COMPANY; OAKS BROTHER'S,
INC.; MILLER COMMERCIAL FLOORING, INC.;
DAVID TIPTON, d/b/a TIPTON CONSTRUCTION;
FELIX THOMSON COMPANY; C & C INDUSTRIAL &
COMMERCIAL CLEARNING SERVICES, LLC; BLEW
LAND SURVEYING, INC, d/b/a BLEW AND
ASSOCIATES, INC.; METRO BUILDERS SUPPLY OF
ROGERS, INC.; AMERICAN AIR CONDITIONING &
MECHANICAL, INC.; THE UNITED STATES OF
AMERICA

THIRD-PARTY
PLAINTIFF

THIRD-PARTY
DEFENDANTS

## BRIEF IN SUPPORT OF CHAMBERS BANK OF NORTH ARKANSAS'S
## MOTION FOR SUMMARY JUDGMENT AGAINST CERTAIN LIEN CLAIMANTS

### I.      INTRODUCTION

Chambers Bank of North Arkansas ("Chambers Bank") brings the present Motion for

Summary Judgment ("Chambers' Motion") asking this Court to find that Chambers Bank's

mortgage interest in the property that forms the subject matter of this action (the "Property") is

valid, and first in right, title, and interest.  As will be set forth in more detail below, several

parties to this litigation claim entitlement to materialmen's liens upon the Property.   These parties further allege that their materialmen's liens have priority over the mortgage interest of Chambers Bank.

No genuine issues of material fact remain to be determined with respect to the priority of Chambers Bank's mortgage interest.   Accordingly, Chambers Bank respectfully requests that this Court grant summary judgment in the present matter and find its mortgage interest to be paramount in right, title, and interest, and to otherwise declare the alleged liens of Vitro America, Inc., d/b/a Binswanger Glass ("Vitro"), Campbell Electric, Inc. ("Campbell"), Flynt & Son Hardwood, Inc. ("Flynt"), Kitchen Distributors, Inc. ("Kitchen"), Johnson Mechanical Contractors, Inc. ("Johnson"), Built-Well Construction Company ("Built-Well"), Don Mobley, d/b/a Mobley Architects, Inc. ("Mobley"), and National Home Centers, Inc. ("NHC") (collectively referred to as Lien Claimants") to be invalid.

### A. The Construction Loan

On December 22, 2005, Chambers Bank extended a construction loan in the original principal amount of $10,135,000.00 (the "Loan") to five co-tenant owners—Commerce Park II, LLC ("Commerce II"), John P. and Elizabeth F. Marinoni (the "Marinonis"), Prime Property Investments, LLC ("Prime Property"), and Next Chapter Resources, LLC ("Next Chapter") (Commerce II, the Marinonis, Prime Property, and Next Chapter collectively referred to as the "Owners", or each individually referred to as a "Owner").   *See* the Land Acquisition, Land Development, Construction And Semi-Permanent Loan Agreement (the "Loan Agreement"), attached to Chambers' Motion as Exhibit "A".   As more specifically described in the Land Development, Construction Mortgage, Security Agreement and Fixture Filing (the "Mortgage"), the purpose of the Loan was for the acquisition of the Property and for paying the direct and

indirect costs associated with construction of a commercial office building (the "Building"). *See* Mortgage, attached to Chambers' Motion as Exhibit "B".

In connection with the Loan, each co-tenant Owner executed and delivered to Chambers Bank certain loan documents, including the Loan Agreement. *See* Exhibit A.  In addition, each co-tenant Owner executed the Mortgage, which conveyed a mortgage interest in the Property to Chambers Bank.  *See* Exhibit B.  The Mortgage, which evidenced each co-tenant Owner's interest in the Property, was filed for record in the real property records of Washington County, Arkansas on December 28, 2008.  *See* Exhibit B.

With respect to the Mortgage, the undisputed facts indicate the following: (a) the Mortgage was signed by each of the Owners and each signature was acknowledged by a notary public; (b) the Mortgage was filed of record with the Washington County Circuit Clerk and Ex-Officio Recorder on December 28, 2005; (c) the Mortgage properly granted, bargained, sold, and conveyed a lien and security interest to Chambers Bank on, among other things, the Property, all improvements, fixtures, equipment, and other personal property of the Owners; (d) the Mortgage secures the Owners repayment of all indebtedness under the Note, including all future advances and all extensions, modifications, increases, and renewals of the same; (e) the Mortgage absolutely and unconditionally obligates Chambers Bank to make the advances under the Loan (*see* Exhibit E, p. 4, Article 1.2); and (f) the Mortgage provides that the Owners agree to use all advanced sums for the purpose of paying a portion of the purchase price for the Property, paying all direct and indirect costs for development of the Property and construction of the improvements and installation of fixtures thereon, and paying for the purchase of materials furnished and the payment of labor performed in connection with the construction of the

Building.  *See* Exhibit B, p. 4, Article 1.3.  Pursuant to the terms of the Loan, proceeds were advanced to the Owners.

**B.  The Lien Claimants and Lockbox Agreements**

The Owners retained Dixie Construction, LLC ("Dixie Construction") as the general contractor for purposes of constructing the Building.  As was its duty as the general contractor, Dixie Construction contracted with various subcontractors and material providers to provide various materials and services for completion of the Building.

During the early part of 2007, on or about the time the Building was substantially completed, a number of material and service providers began to allege that Dixie Construction had failed to make payment for certain invoices related to labor or materials allegedly incorporated into the Property (the "Lien Claims").   *See* Deposition of Bob Harrison, representative for Chambers Bank, p. 14, ll. 19-25, pertinent parts attached to Chambers' Motion as Exhibit "C".  In an effort to satisfy the alleged Lien Claims, Dixie Construction, Ben Israel, Nancy Israel, the Benny Bert Israel Revocable Trust, u/t/d June 17, 1997, and the Nancy Kaye Israel Revocable Trust, u/t/d June 17, 1997 (collectively, the "Israel Parties") requested that Chambers Bank make a loan to the Israel Parties for the purpose of satisfying a substantial portion of the Lien Claims.  *See* Exhibit C, p. 15.  All of the interested parties contemplated that, thereafter, the Israel Parties would obtain future permanent and bridge loan financing to complete the construction of the Property.  *See* Lien Release and Lockbox Agreements, executed by each Lien Claimant (each a "Lockbox Agreement" and collectively the "Lockbox Agreements"), introductory paragraph, true and correct copies of which are attached to Chambers' Motion as Exhibits "D(i)"—"D(vii)".   It was further contemplated that said permanent and bridge loan financing was contemplated to be sufficient to satisfy both the

Mortgage and the remaining amounts allegedly outstanding to the Lien Claimants. *See* Exhibits D(i)—D(vii).

In accordance with the contemplation of the parties, and subject to the satisfaction of certain conditions and agreements made by the potential Lien Claimants themselves, Chambers Bank undertook additional risk and conditionally agreed to make available additional monies to the Israel Parties for cost overruns on the Building. *See* Exhibit C, p. 16, ll. 4-9. The additional line of credit was secured by a Line of Credit Promissory Note, dated May 3, 2007, which was executed by each of the Israel Parties (the "LOC Note"). A true and correct copy of the LOC Note is to Chambers' Motion as Exhibit "E" and is incorporated herein by reference. Proceeds advanced pursuant to the LOC Note were paid by Chambers Bank directly to the Lien Claimants. *See* Exhibit E, p. 4. The amounts paid by Chambers Bank directly to the Lien Claimants were sufficient to satisfy approximately three-fifths of the amounts allegedly due and owing to each respective potential Lien Claimant. *See* Affidavit of Bob Harrison, attached to Chambers' Motion as Exhibit "F". Advances under the LOC Note were conditioned upon the receipt of documentation from both the Israel Parties and each potential Lien Claimant. *See* Exhibit C, p. 16. Among those documents required, Chambers Bank required the Israel Parties and the individual potential Lien Claimants to acknowledge that the Mortgage was superior to any potential lien claims asserted by the Lien Claimants.[1] *See* Exhibit C, p. 17, ll. 19-24; *see also* Exhibits D(i)—D(vii).

Each Lockbox Agreement indicated that the parties thereto entered "this Lien Release and Lockbox Agreement . . . for *the mutual covenants contained herein and other good and*

---

[1] Flynt did not execute a Lockbox Agreement, and therefore, the arguments of Chambers Bank related to the Lockbox Agreement should not be applied against Flynt. As will be more fully explored below, however, Flynt failed to strictly comply with Ark. Code Ann. § 18-44-101, et seq. Accordingly, the lien claims of Flynt are invalid and Chambers Bank is entitled to summary judgment declaring the same.

*valuable consideration, the receipt, adequacy and sufficiency are hereby acknowledged by all of the undersigned parties.*" *See* Exhibits D(i)—D(vii), p. 1.  The Lockbox Agreements further stated that, through permanent financing, it was the Israel Parties' intent to "retire the debt to Chambers Bank of North Arkansas . . . which is evidenced by [the Mortgage] . . . ." *See* Exhibits D(i)—D(vii), p. 1.  To that end, the Lockbox Agreement stated as follows:

> 2.    Upon the funding of such permanent financing, all proceeds of such financing shall be applied as follows:
>
> FIRST, all funds necessary to indefeasibly pay in full the debt to Chambers *which is (a) secured by the Mortgage **which is valid, enforceable and first in priority**, (b) evidenced by any loan document dated of even date with the Mortgage, (c) secured by any other mortgage or lien against the property, or (d) otherwise,*
>
> SECOND, provided the debt to Chambers is indefeasibly paid in full . . . for the purpose of paying all remaining balances due to the [particular lien claimant] . . . .

*See* Exhibits D(i)—D(vii), p. 2, paragraph enumerated 2 (emphasis added).

Chambers Bank required the execution of the Lockbox Agreements prior to advancing funds, in part due to the acknowledgment and covenant by the potential lien claimant that the Mortgage was "*valid, enforceable, and first in priority* . . . ." (the "Admission and Acknowledgment").  *See* Exhibit C, p. 17, ll. 19-24; *see also* Exhibit C, p. 39, ll. 10-12; *see also* Exhibits D(i)—D(vii), p. 2, paragraph enumerated 2 (emphasis added).  The Admission and Acknowledgment made by each of the Lien Claimants was crucial to Chambers Bank's determination of whether the conditions to advances under the LOC Note were satisfied.  *See* Exhibit C, p. 17, ll. 19-24; *see also* Exhibit C, p. 39, ll. 10-12; *see also* Exhibit F.  Based upon the discretion provided to Chambers Bank under the LOC Note, Chambers Bank would not have approved any advances for funds under the LOC Note if it believed that the beneficiaries of such advances would ignore their prior representation in the Admission and Acknowledgment and

attempt to contest either the validity, enforceability or priority of the Mortgage. *See* Exhibit C, p. 17, ll. 19-24; *see also* Exhibit C, p. 39, ll. 10-12.

As previously stated, each potential Lien Claimant, aside from Flynt, executed a Lockbox Agreement. However, in *no situation* did any owner other than Commerce II sign any of the Lockbox Agreements. *See* Exhibits D(i)—D(vii) (evidencing that Next Chapter, Prime Properties, and the Marinonis were not included as parties to the Lockbox Agreement). In fact, no allegation or evidence has been produced throughout the course of discovery indicating that the remaining Owners were ever aware that Lockbox Agreements had been executed. In addition, it is of note that Chambers Bank was a signatory to four discrete Lockbox Agreements, namely those executed by Kitchen, Campbell, Johnson, and Built-Well Construction, Inc. *See* Exhibits D(i), D(ii), D(iii), and D(iv), respectively.

Save and except for Flynt, the Lien Claimants received proceeds from the LOC Note after executing the Lockbox Agreement. *See supra,* footnote 1. As previously stated, the Lien Claimants received proceeds amounting to approximately three-fifths of all amounts allegedly due to them pursuant to their respective subcontracts. *See* Exhibit F.

Despite receiving substantial amounts that were allegedly due and outstanding under their contracts, the Lien Claimants alleged that they were not paid the remaining amounts contemplated pursuant to the Lockbox Agreements. Accordingly, some time after August 1, 2007, the Lien Claimants each filed mechanics' and materialmen's liens against the Property. Thereafter, one of the Lien Claimants—Vitro—instituted this foreclosure action, asking this Court to determine the priority of any liens upon the Property. Several additional Lien Claimants joined this action and affirmatively asserted entitlement to priority, despite the clear language of the Lockbox Agreements.

As will be more fully explored below, no genuine issues of material fact remain to be determined with respect to the interpretation of the Admission and Acknowledgment. Accordingly, this Court should interpret the Lockbox Agreements as a matter of contract, finding that the Mortgage is "valid, enforceable, and first in priority."   Matters of contractual interpretation aside, no genuine issues of material fact remain to be determined with respect to the interpretation of the Admission and Acknowledgment, and this Court should declare the same to preclude the Lien Claimants from asserting priority in this matter.   Finally, notwithstanding the Lockbox Agreement, the liens of the Lien Claimants are invalid as a matter of law and Chambers Bank is entitled to summary judgment declaring the same.

## II. <u>ARGUMENT AND AUTHORITY</u>

### A. **Summary Judgment Standard**

Summary judgment is proper if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Sappington v. Skyjack, Inc.*, 512 F.3d 440, 445 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c).   When ruling on a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party. *Sappington*, 512 F.3d at 445.   However, the "'nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'" *FDIC v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997) (quoting *Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*, 64 F.3d 1202, 1211 (8th Cir. 1995)).   Also, the "nonmoving party must do more than rely on allegations or denials in the pleadings, and the elements of its prima facie case must be supported by specific facts sufficient to raise a genuine issue for trial." *Skare v. Extendicare Health Servs.*, 515 F.3d 836, 840 (8th Cir. 2008).

**B. By Execution of The Lockbox Agreement, The Lien Claimants' Affirmed That Their Alleged Liens Were Subordinate to The Mortgage**

As previously stated, the Lockbox Agreement contains a provision describing the Mortgage as "valid, enforceable, and first in priority . . . ." *See* Exhibits D(i)—D(vii), paragraph enumerated number 2. The Lien Claimants were required to sign the Lockbox Agreement prior to receipt of funds that satisfied approximately three-fifths of each Lien Claimant's outstanding accounts. *See* Exhibit F. The language of the Lockbox Agreements is clear and unambiguous. By signing the Lockbox Agreement, the Lien Claimants, therefore, acknowledged that the Mortgage enjoyed priority over any of their alleged lien claims.

As was previously stated, Chambers Bank was a party to those Lockbox Agreements executed by Kitchen, Built-Well, Johnson, and Campbell. *See* Exhibits D(i)—D(iv). Accordingly, this Court may determine the meaning of the Admission and Acknowledgment contained within the Lockbox Agreement as a matter of contractual interpretation as to the above named Lien Claimants. The remaining Lockbox Agreements were not executed by Chambers Bank. However, in each particular case, Chambers Bank relied upon the Admission and Acknowledgment in distributing additional proceeds for the payment of the alleged lien claims. *See* Exhibit C, p. 17, ll. 19-24; *see also* Exhibit C, p. 39, ll. 10-12. No genuine issue of fact remains with respect to whether the Lien Claimants should be estopped from claiming, or have otherwise waived the right to claim that their liens have priority over the Mortgage. Accordingly, summary judgment is appropriate.

> *1. This Court may interpret the contractual language of the Lockbox Agreement as a matter of law.*

The construction and legal effect of written contracts are matters to be determined by the court, not by the jury, except when the meaning of the language depends upon disputed extrinsic

evidence. *See U.S. Fid. & Guar. Co. v. Cont'l Cas. Co.*, 353 Ark. 834, 841, 120 S.W.3d 556,

560 (2003); *see also Kremer v. Blissard Management & Realty, Inc.*, 289 Ark. 419, 421, 711

S.W.2d 813, 815 (1986). When a contract is unambiguous, the "construction and legal effect" of

the contract are questions of law which lie exclusively within the province of the court. *Cranfill*

*v. Union Planters Bank*, 86 Ark. App. 1, 13-14, 158 S.W.3d 703, 711 (2004). Moreover, when a

contract is unambiguous, testimony concerning the meaning and construction of the contract is

irrelevant. *B.G. Coney Co. v. Radford Petroleum Equipment Co.*, 287 Ark. 108, 111, 696

S.W.2d 745, 747 (1985). A contract should not be considered ambiguous unless there is

uncertainty of the meaning in a written instrument. *Hanners v. Giant Oil Co. of Ark., Inc.*, No.

07-1314, 2008 Ark. LEXIS 332 (May 15, 2008) (citing Black's Law Dictionary 88 (8th ed.

2004)). In the case at bar, the language contained within the Lockbox Agreement—specifically

the Admission and Acknowledgment—is definite and certain. It clearly describes the nature of

the Mortgage without qualification. There is no uncertainty as to the meaning of the Admission

and Acknowledgment. The interpretation or meaning of the Admission and Acknowledgment

does not require the assistance of testimony or other extrinsic evidence. Accordingly, this Court

should interpret the language contained within the Lockbox Agreement as a matter of law, and

extrinsic evidence should not be considered by this Court in interpreting the contractual

language.

Chambers Bank was a signatory to the Lockbox Agreements of Kitchen, Built-Well,

Johnson, and Campbell. Based in part upon the Admission and Acknowledgment of Kitchen,

Built-Well, Johnson, and Campbell, Chambers Bank advanced an additional $904,476.86 in

order to provide payment for approximately three-fifths of those amounts allegedly due and

owing to them. *See* payment receipts attached to Motion as Exhibits "G", "H", "I", and "J",

respectively; *see also* Exhibit F.  Kitchen, Built-Well, Johnson, and Campbell each indicated that the parties to the Lockbox Agreement provided consideration in contemplation of the same.  *See* Exhibits D(i)—D(iv), p. 1, introductory paragraph.  In fact, in consideration of the Lockbox Agreement, Chambers Bank accepted additional risk that it was not otherwise required to accept based in part upon the terms of the Lockbox Agreement.  *See* Exhibit F.  Despite representing that the Mortgage was first in priority, and despite receiving substantial benefits based upon said covenant and representation, Kitchen, Built-Well, Johnson, and Campbell now wish to ignore the covenants contained within their respective Lockbox Agreements and directly contest the priority of the Mortgage.

Chambers Bank asserts that the language contained within the Lockbox Agreement is not ambiguous and does not rely upon disputed extrinsic evidence.  This Court may interpret the Admission and Acknowledgment as a matter of law, finding the language dispositive as to the issue of priority.  Accordingly, because the Court may interpret the language as a matter of law, there is no genuine issue of material fact as it relates to the meaning of the Lockbox Agreement, and summary judgment is appropriate as to the interpretation of the Admission and Acknowledgment is Appropriate.

2. *Chambers Bank is Entitled to Declaratory Judgment on The Issue of The Priority of Its Mortgage*

Notwithstanding the fact that this Court may interpret the Admission and Acknowledgment as a matter of contractual interpretation as to Kitchen, Built-Well, Johnson, and Campbell, this Court may further interpret the language pursuant to Chambers Bank's request for declaratory judgment. Ark. Code Ann. § 16-111-104 states specifically that "[a]ny person interested under a . . . written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any

question of construction or validity arising under the instrument . . . [or] contract . . . ." The Arkansas Supreme Court has aptly noted that a declaratory judgment action may be brought by one seeking to "avoid uncertainty and insecurity with respect to rights, status, and other legal relations." *Newcourt Fin., Inc. v. Canal Ins. Co.*, 341 Ark. 181, 187, 15 S.W.3d 328, 331-32 (2000) (citing Ark. Code Ann. §§ 16-111-101 et seq.). Declaratory judgment actions are to be liberally construed in resolving uncertainty in rights, status, and legal relations. *Wilmans v. Sears, Roebuck & Co.*, 355 Ark. 668, 672, 144 S.W.3d 245, 247 (2004). "Declaratory relief will lie where (1) there is a justiciable controversy; (2) it exists between parties with adverse interests; (3) those seeking relief have a legal interest in the controversy; and (4) the issues involved are ripe for decision." *Id.* at 673, 144 S.W.3d at 248.

In the case at bar, this Court should determine the meaning of the Lockbox Agreement as a matter of law. As noted above, the Admission and Acknowledgment relates directly to the priority of the Mortgage, and constitutes an admission of validity and superiority. Chambers Bank advanced loan proceeds based upon the language of the Lockbox Agreement and expected that the declaration of its rights pursuant to the Lockbox Agreement would be given effect. *See* Exhibit C. Despite this fact, the Lien Claimants have appeared in the present suit, seeking to avoid the application of the plain terms of the Lockbox Agreement ineffectual. Thus, a justiciable controversy affecting the rights of Chambers Bank and the Lien Claimants exists. The meaning of the language included within the Lockbox Agreement is ripe for determination and this Court may properly grant declaratory judgment in this matter because the only remaining issue relates to the interpretation of an unambiguous contract.

Regardless of whether Chambers Bank was a signatory to any particular Lockbox Agreement, the language contained within the Lockbox Agreement is unambiguous and should

be interpreted as a matter of law by this Honorable Court.   Because the contractual language affects the rights of Chambers Bank, Chambers Bank is entitled to a declaration of the meaning of the Admission and Acknowledgment.   No genuine issue of material fact remains as to the unambiguous meaning of the language.   Therefore, Chambers Bank respectfully requests that this Court grant summary judgment, interpreting the language of the Lockbox Agreement as a declaration that the Mortgage is first in priority over any alleged lien claims of those Lien Claimants that executed the Lockbox Agreement.

3. *The Lien Claimants Should Be Estopped From Asserting Priority Over the Mortgage or Have Otherwise Waived Any Claim of Priority*

Notwithstanding the fact that this Court should interpret the contractual language of the Lockbox Agreement as a matter of law, the Lien Claimants should be equitably estopped from asserting that their lien claims enjoy priority over the Mortgage.   With respect to equitable estoppel, the Arkansas Supreme Court has stated that "equitable estoppel requires that an innocent person be misled to his or her detriment, so that it would be inequitable to permit the person estopped to change an original position." *Owners Ass'n of Foxcroft Woods, Inc. v. Foxglen Assocs.*, 346 Ark. 354, 367, 57 S.W.3d 187, 196 (2001).   Moreover, "[i]n order to prove estoppel, the party asserting the defense must prove the following elements: (1) the party to be estopped knew the facts; (2) the party to be estopped intended that the conduct be acted on; (3) the party asserting the estoppel was ignorant of the facts; and (4) the party asserting the estoppel relied on the other's conduct and was injured by that reliance." *Id.* at 368, 57 S.W.3d at 196. The conduct of the party to be estopped may consist of declarations or admissions, or failure to act or speak. *Id.*   The second element of estoppel has been alternatively stated as follows: "the person to be estopped must intend that his conduct shall be acted on *or must so act that the party asserting the estoppel had a right to believe it is so intended.*" *Id.* (emphasis added).

In the present case, the Lien Claimants represented to Chambers Bank by way of the Admission and Acknowledgment that the Mortgage was superior in right, title, or interest. *See* Exhibit D(i)—D(vii). Chambers Bank relied upon the statements made within the Lockbox Agreement and, as a result, advanced funds to the Lien Claimants. *See* Exhibit C, p. 17, ll. 19-24; *see also* Exhibit C, p. 39, ll. 10-12. The advance of the funds pursuant to the Lockbox Agreement operated to satisfy approximately three-fifths of the amounts outstanding to the Lien Claimants. The advance of funds pursuant to the Lockbox Agreement has caused damage to Chambers Bank inasmuch as it has assumed additional risk in lending proceeds for completion of the building that it may not have otherwise advanced. Had Chambers Bank known that the Lien Claimants intended to assert entitlement to priority, Chambers Bank could have refused to advance the funds and could have allowed the Court to flesh out the issues of priority in a foreclosure lawsuit all without exposing itself to greater risk. *See* Deposition of Robert Taylor, p. 60-61, pertinent portions attached to Motion as Exhibit "K". However, Chambers Bank opted to advance the proceeds, believing that the Lien Claimants acknowledged the priority of the Mortgage.

Chambers Bank advanced funds to satisfy approximately three-fifths of amounts allegedly due to the Lien Claimants. *See* Exhibit F. It would be inequitable to allow the Lien Claimants to now change their position, asserting priority over the Mortgage in contravention of the duly executed Lockbox Agreements. No genuine issues of material fact remain with respect to whether the Lien Claimants should be equitably estopped from asserting priority over the Mortgage. Accordingly, summary judgment is appropriate in this case.

In addition, by executing the Admission and Acknowledgment, the Lien Claimants affirmatively waived their rights to claim that their respective liens enjoyed priority over the

Mortgage. No genuine issue of material fact remains to be determined with respect to whether execution of the same constitutes a waiver, and the summary judgment is, therefore, appropriate.

**C. The Liens Asserted by The Lien Claimants Are Invalid as a Matter of Law**

Notwithstanding the above arguments, the liens claimed by the Lien Claimants are invalid or otherwise unenforceable as a matter of law. Accordingly, Chambers Bank is entitled to summary judgment on the issue of the invalidity of the liens of the Lien Claimants.

*1. Perfecting a Valid Lien and Lienable Amounts*

By enactment of the Arkansas Materialman's Lien Statute, as stated at Ark. Code Ann. § 18-44-101, et seq. (the "Lien Statute"), the Arkansas legislature has provided a mechanism whereby a contractor, subcontractor, or material provider may protect his right to payment by virtue of a materialmen's lien. The Lien Statute provides that "[e]very contractor, subcontractor, or material supplier . . . who supplies labor, services, [or] material . . . in the construction or repair of an improvement to real estate . . . by virtue of a contract with the owner . . . or agent thereof, *upon complying with the provisions of this subchapter*, shall have, to secure payment, a lien upon the improvement . . . ." Ark. Code Ann. § 18-44-101 (emphasis added). It is not enough to substantially comply with the provisions of the Lien Statute. Instead, the Arkansas Supreme Court has held that because the Lien Statute creates a remedy in derogation of the common law, the provisions of the Lien Statute are to be strictly construed and strict compliance is required. *See Books-A-Million, Inc. v. Arkansas Painting and Specialties Co.,* 340 Ark. 467, 10 S.W.3d 857 (2000).

The Lien Statute further sets forth particular notice requirements with which a potential lien claimant must comply. Specifically, a potential lien claimant must comply with the notice requirements of Ark. Code Ann. § 18-44-114 (the "Ten Day Notice") and Ark. Code Ann. § 18-44-115(e) (the "Commercial Notice"). The Ten Day Notice mandates that

> [e]very person who may wish to avail himself or herself of the benefit of the
> provisions of this subchapter shall give ten (10) days' notice before the filing of
> the lien, as required in § 18-44-117(a), to the owner . . . that he or she holds a
> claim against the building or improvement, setting forth the amount and from
> whom it is due.

The Ten Day Notice may be served either by (a) an officer authorized by law to serve process in

a civil action, (b) a person who would be a competent witness, or (c) by a form of mail addressed

to the person to be served with a return receipt requested and delivery restricted to the addressee

or the agent of the addressee. *See* Ark. Code Ann. § 18-44-114(b)(1).  When the Ten Day Notice

is served by mail, Ark. Code Ann. § 18-44-114(b)(1) requires that the service be verified by a

return receipt signed by the addressee or the agent of the addressee, or by a returned envelope,

postal document, or affidavit by a postal employee reciting or showing refusal of the notice by

the addressee. *See* Ark. Code Ann. § 18-44-114(b)(2)(B)(i).

It is not enough for a potential lien claimant to provide the Ten Day Notice required by

Ark. Code Ann. § 18-44-114.  In addition, on a commercial construction project, the potential

lien claimant must also provide the Commercial Notice contemplated by Ark. Code Ann. § 18-

44-115(e)(2) ("Section 115(e)(2)"), which provides that:

> (A)  No material supplier or laborer shall be entitled to a lien unless the material
> supplier or laborer notifies the owner of the commercial real estate being
> improved, in writing, that the material supplier or laborer is currently entitled to
> payment but has not been paid.

> (B)(i) The notice shall be sent to the owner and to the contractor before seventy-
> five (75) days have elapsed from the time that the labor was supplied or the
> materials furnished.

Ark. Code Ann. § 18-44-115(e)(2) further describes particular information and language that

must be included in the Commercial Notice[2] and provides that the Commercial Notice may be

*served* either by an officer authorized by law to serve process in civil actions, or by a form of

---

[2] The language required by Section 115(e) will be discussed more specifically below as it relates the alleged lien
claim of Flynt.

mail addressed to the person to be served with a return receipt requested and delivery restricted to the addressee or the agent of the addressee. A lien claimant who fails to provide the notices required by either of the above sections cannot perfect its lien as a matter of law.

In *Books-A-Million*, *supra*, the Arkansas Supreme Court examined the validity of a purported lien when the lien claimant failed to provide the Commercial Notice as required by statute. In *Books-A-Million*, the lien claimant sent notices which did not meet the requirements of the Lien Statute. 340 Ark. at 472-73, 10 S.W.3d at 861. The court held that "[t]he notice provisions contained in [the Lien Statute] must be complied with strictly." *Id.* at 472, 10 S.W.3d at 861. Because the potential lien claimant failed to comply with the statutory notice provisions, the court found that the lien was invalid as a matter of law. *Id.* at 472-73, 10 S.W.3d at 861.

Assuming a potential lien claimant complies with both the Ten Day Notice and the Commercial Notice provisions, the potential lien claimant must then file its lien within one hundred twenty (120) days of providing labor or materials to the subject property. *See* Ark. Code Ann. § 18-44-117(a). If a lien claimant fails to timely file its lien, the lien is not perfected and cannot be enforced. *See Servewell Plumbing, LLC v. Summit Contrs., Inc.*, 362 Ark. 598, 606, 210 S.W.3d 101, 107 (2005).

Finally, when a potential lien claimant files its lien account, it is required by Ark. Code Ann. § 18-44-117(a)(1)(B) to attach an affidavit of notice to the lien account.[3] The affidavit of notice must contain "[a] sworn statement evidencing compliance with the notice provisions of §§ 18-44-114 – 18-44-116" and "[a] copy of each notice given under §§ 18-44-114 – 18-44-116." Ark. Code Ann. § 18-44-117(a)(3).

---

[3] The requirements pertaining to the affidavit of notice were added to Ark. Code Ann. § 18-44-117(a) by 2007 Ark. Acts 810, which became effective on July 31, 2007. *See* Ark. A.G. Op. No. 2007-164, 2007 Ark. AG LEXIS 143 (May 7, 2007). Therefore, all liens filed after July 31, 2007 are subject to these requirements.

In addition to the statutory requirements, Arkansas courts have found that the Lien Statute imposes certain limitations on the amounts that one can claim as lienable. For example, under Arkansas law, a materialman's lien cannot include amounts for costs of supervision of subcontractors. *See Cook v. Moore*, 152 Ark. 590, 594-95, 239 S.W. 750, 751-52 (1922); *Royal Theater Co. v. Collins*, 102 Ark. 539, 144 S.W. 919 (1912); *see also Hickman v. Kralicek Realty & Constr. Co.*, 84 Ark. App. 61, 129 S.W.3d 317 (Ark. Ct. App. 2003). The foregoing authority remains good law. In *Royal Theater Co.*, the contractor had filed a lien for a certain sum of money, but did not show that the debt was a debt due to him for labor or services the contractor performed and he did not prove that it was for materials furnished by the contractor. The court held that the contractor was not entitled to a lien under the statute, as the statute

> only gives the contractor a lien for work done by him or materials furnished by him. The proof in the case shows that a certain sum of money is due... but it does not show that this is a debt due him for services performed by him or for materials furnished by him.[4]

*Royal Theater Co.*, 102 Ark. at 541, 144 S.W. at 920.

In *Cook*, a builder filed a lien on property after the owner failed to make payment. *Cook*, 152 Ark. at 594, 239 S.W. at 751. The Court found that nearly the entire amount claimed by the builder in his lien represented amounts paid by him to laborers and mechanics for working on the house. *Id.* So, where the contractor did not labor as a mechanic, but, instead, superintended work done by others, or paid for the same, the Court held that he was not entitled to a lien. *Id.* at 595, 239 S.W. at 752 (holding specifically that the lien could only apply to "materials actually furnished by him and labor actually performed by him in the repair of the building"). Since the

---

[4] The statute applicable at the time the *Royal Theater Co.* case was decided provided that "every mechanic, builder, artisan, workman, laborer or other person, who shall do or perform any work or labor upon or furnish any materials for any building, . . . upon complying with the provisions of this act, shall have a lien for his work or labor done or materials furnished." *Royal Theater Co.*, 102 Ark. at 541, 144 S.W. at 920.

contractor in *Cook* had only acted in a supervisory role by overseeing his vendors and subcontractors, the contractor was not entitled to claim a lien. *Id.* at 595-96, 239 S.W. at 752.

*Hickman,* a more recent case, also addressed the lienability of amounts owing or paid to a subcontractor, stating that "[t]he Arkansas Supreme Court has held that the mechanics' and materialmens' lien statute . . . gives a lien to the person who performs the labor and not to the person who hires labor performed and pays for it." *Id.* at 67, 129 S.W.3d at 321 (citing *Middleton v. Watkins Hardware Co.*, 196 Ark. 133, 116 S.W.2d 1043 (1938); *Simmons First Bank v. Bob Callahan Servs., Inc.*, 340 Ark. 692, 13 S.W.3d 570 (2000)). This concept was likewise discussed in *Valley Pine Lumber Co. v. Hodgens*, 80 Ark. 516, 97 S.W. 682 (1906), in which the Supreme Court stated:

> [Hodgens] paid the laborers whom he hired to assist him . . . . [T]he statute as written gives the lien to the one who performs the labor, and not to the one who hires labor performed and pays for it. Nor did this payment operate as an assignment of the lien of the laborer whose debt was paid. When Hodgens paid the laborer whom he hired to assist him, he discharged a debt which he owed, and his payment did not operate as an assignment to him of the lien held by the laborer for his debt. The effect of the payment was to extinguish both the debt and the lien, for the lien could not exist after the debt on which it was based had been discharged.

*Id.* at 518, 97 S.W. at 682 (internal citation omitted).

>    2. *The lien alleged by Flynt is invalid because of Flynt's failure to comply with the requirements of the Lien Statute*

As a preliminary matter, Flynt was not a party to the Lockbox Agreement; therefore, Chambers Bank does not assert entitlement to priority based upon the provisions of the same. Instead, Chambers Bank asserts entitlement to priority based upon the fact that the Flynt Lien is, as a matter of law, invalid because of Flynt's failure to comply with the notice provisions of the Lien Statute.

On July 6, 2007, Flynt filed certain materialmen's liens (the "Flynt Liens"). The Flynt Liens, which were recorded in the real estate records of Washington County, Arkansas at File Numbers L078-00000490, L078-00000491, and L078-00000492, indicate that Flynt failed to serve the Ten Day Notice upon *all* of the Owners. *See* Flynt Liens, true and correct copies of which are attached to Chambers' Motion as Exhibits "L", "M", and "N", respectively. Specifically, Flynt failed to send the Ten Day Notice to Prime Property. *See* Ten Day Notice of Flynt, a true and correct copy attached to Chambers' Motion as Exhibit "O" (the "Flynt Ten Day Notice"), a copy of the Flynt Ten Day Notice is also attached to the Flynt Liens as Exhibit "B" thereto. In addition, the Flynt Liens indicate that the Ten Day Notice sent to Commerce Park, c/o Ben B. Israel was signed for by someone other than Ben Israel. *See* Exhibit O, signature return receipts being attached thereto and incorporated therein. In addition to Flynt's failure to send notice to Prime Property, Flynt has failed to provide any indication that the Flynt Ten Day Notice was actually served upon Next Chapter Resources, c/o Tom Muccio.

In the instant case, at the time of the service of the Flynt Ten Day Notice, the Property was owned by the Marinonis, Commerce Park, Next Chapter, *and Prime Property*. As explained above, proper statutory notice must be given to the owners of the property at issue in order for a potential lien claimant to perfect its lien. There is no indication that Flynt properly served any representative of Commerce Park II, Next Chapter, or Prime Property with the Flynt Ten Day Notice. In fact, the evidence presented herein indicates that Flynt failed to *send* notice to Prime Property—one of the fee owners in the Property. Because Flynt failed to properly serve the Ten Day Notice upon Next Chapter and Prime Property, Flynt has not complied with the Ten Day Notice provision. Because the Arkansas courts insist upon strict compliance with the requirements of the Lien Statute, the Flynt Liens are invalid.

The Flynt Liens are also invalidated by Flynt's failure to properly serve the Commercial Notice. Although it appears that the Flynt Ten Day Notice was intended to comply with the requirements of Ark. Code Ann. § 18-44-114, it is not sufficient to serve as the Commercial Notice. As mentioned above, particular language and information must be included in the Commercial Notice required by Ark. Code Ann. § 18-44-115(e)(2). Specifically, the Commercial Notice must contain, in boldface type, the following notice:

**NOTICE TO PROPERTY OWNER**

**IF BILLS FOR LABOR, SERVICES, OR MATERIALS USED TO CONSTRUCT AN IMPROVEMENT TO REAL ESTATE ARE NOT PAID IN FULL, A CONSTRUCTION LIEN MAY BE PLACED AGAINST THE PROPERTY. THIS COULD RESULT IN THE LOSS, THROUGH FORECLOSURE PROCEEDINGS, OF ALL OR PART OF YOUR REAL ESTATE BEING IMPROVED. THIS MAY OCCUR EVEN THOUGH YOU HAVE PAID YOUR CONTRACTOR IN FULL. YOU MAY WISH TO PROTECT YOURSELF AGAISNT THIS CONSEQUENCE BY PAYING THE ABOVE NAMED PROVIDER OF LABOR, SERVICES, OR MATERIALS DIRECTLY, OR MAKING YOUR CHECK PAYABLE TO THE ABOVE NAMED PROVIDER AND CONTRACTOR JOINTLY.**

*See* Ark. Code Ann. § 18-44-115(e)(2)(C)(v). There is no indication that Flynt sent the Commercial Notice, which must require the above stated language, to the Owners. Because failure to send such notice invalidates any alleged materialmen's lien, the Flynt Liens are invalid as a matter of law. *See Books-A-Million* at 472-73, 10 S.W.3d at 861. The court held that "[t]he notice provisions contained in [the Lien Statute] must be complied with strictly." *Id.* at 472, 10 S.W.3d at 861.

Because of Flynt's above-described failures to comply with the requirements of the Lien Statute, the Flynt Liens are invalid. Summary judgment in favor of Chambers Bank should be granted as to Flynt.

### 3. The Built-Well Lien Is Invalid Because of Built-Well's Failure to Comply with the Requirements of the Lien Statute

On or about March 28, 2008, Built-Well filed its Answer, Counterclaim and Cross-Claim to Counterclaim, Cross-Claim and Third Party Complaint of Chambers Bank herein ("Built-Well's Cross-Claim"). A copy of the lien filed by Built-Well against the Property (the "Built-Well Lien") is attached to Built-Well's Cross-Claim as Exhibit A, and has also been attached to Chambers' Motion as Exhibit "P". The Built-Well Lien was recorded in the real estate records of Washington County, Arkansas on August 2, 2007, at File Number L078-00000932. An Affidavit of Notice is attached to and incorporated into the Built-Well Lien, and a copy of the notice allegedly sent by Built-Well to the Owners is attached as Exhibit A thereto (the "Built-Well Affidavit").

The Built-Well Lien is invalid because it was not timely filed. As discussed above, Ark. Code Ann. § 18-44-117(a) requires that a lien claimant file its lien within 120 days of providing labor or materials to the subject property. Built-Well was hired to provide services relating to four specific portions of the Building: (1) the Building shell (the "Shell"); (2) the finish of the tenant space of Clear Channel Radio (the "Clear Channel Finish"); (3) the finish of the tenant space of Nestle Purina (the "Nestle Purina Finish"); and, (4) the finish of the Dixie Development tenant space (the "Dixie Finish"). In its responses to discovery requests propounded by Chambers Bank, Built-Well produced certain timesheets showing the end date of work on the Nestle Purina job, the Dixie Development job, and the Building shell job (the "Built-Well Timesheets"). *See* Built-Well Timesheets attached to Chambers' Motion as Exhibits "Q", "R", and "S", respectively. In her deposition, Vicky Burch ("Ms. Burch"), representative of Built-Well, testified that the Built-Well Timesheets indicated that the last dates upon which labor or materials were provided by Built-Well in connection with the above-referenced jobs. Deposition

of Vicky Burch, p. 19, pertinent portions attached to Chambers' Motion as Exhibit "T". Ms. Burch testified that she wrote "End date of job" on the Built-Well Timesheets to "help let you know this was the actual last date that Jim Townsend, who was the last guy working on the job, performed—performed his duties there." *See* Exhibit T, p. 19, l. 18-20. Further, Ms. Burch stated that "the job is done when my lead guy, which is Jim Townsend, reports his last hours." *See* Exhibit T, p. 20, l.11-12.    Per the Built-Well Timesheets, then, last date any work was completed on either the Shell, the Nestle Purina Finish, or the Dixie Finish was February 26, 2007. *See* Exhibits Q, R, and S.

No timesheet was provided by Built-Well for the Clear Channel Finish.  However, Ms. Burch explained that the Job Cost - Labor Report ("Job Cost Report"), produced by Built-Well in discovery, would allow an approximation of the completion date of the Clear Channel Finish. A true and correct copy of the Job Cost Report related to the Clear Channel Finish, which was provided by Built-Well in discovery, is attached to Chambers' Motion as Exhibit "U". Ms. Burch stated that the Job Cost Report indicates when Built-Well workers were paid for their services.[5] *See* Exhibit T, p. 21, ll. 19-24. Further, with respect to the entries, Ms. Burch stated that Built-Well has a "warehouse gentleman . . . that goes to our job sites after the main guys are done to pick up material or do whatever he needs to do, and to me, the job is done when my lead guy, which is Jim Townsend, reports his last hours." *See* Exhibit T, p. 20. According to the Job-Cost Report related to the Clear Channel Finish, Mr. Townsend last provided services on the job on February 16, 2007. *See* Exhibit U, p. 6. Moreover, outside of the warehousing entry, which Ms. Burch testified was work performed *after* the job was completed, Built-Well wrote its last

---

[5] Although Ms. Burch was testifying specifically with respect to the Job Cost Report for the Nestle Purina Finish, she further testified that the same reading could be applied to each respective Job Cost Report for the Shell, Clear Channel Finish, and Dixie Finish. *See* Exhibit T, pp. 22-23.

**BRIEF IN SUPPORT OF CHAMBERS BANK OF NORTH ARKANSAS'S MOTION FOR SUMMARY JUDGMENT AGAINST CERTAIN LIEN CLAIMANTS – Page 24 of 33**
634497_1.DOC

check for labor on the Clear Channel Finish on March 9, 2007. *See* Exhibit U, p. 6 (entry for Josh Schnitzer). Accordingly, it is apparent that that work was completed no later than that date.

Therefore according to the testimony of Built-Well representatives, no labor or materials were provided or furnished by Built-Well at least one week prior to March 9, 2007. The Built-Well Lien was not filed until August 2, 2007—146 days after March 9, 2007. Thus, the evidence indicates that Built-Well failed to file the Built-Well Lien within 120 days of providing labor or materials to the Property, and it has therefore failed to perfect the Built-Well Lien. This defect renders the Built-Well Lien invalid as a matter of law.

In addition, the Built-Well Lien is also invalid because of Built-Well's failure to verify service of the Ten Day Notice. As explained above, Section 114 requires that when service of the Ten Day Notice prescribed therein is accomplished by mail, the service must be verified by a return receipt signed by the addressee or the agent of the addressee, or by evidence of refusal of the notice. *See* Ark. Code Ann. § 18-44-114(b)(2)(B). No such verification was made in connection with the filing of the Built-Well Lien. Therefore, the Built-Well Lien is invalid for failure to comply with the requirements of the Lien Statute.

Because of Built-Well's above-described failures to comply with the requirements of the Lien Statute, the Built-Well Lien is invalid. Chambers Bank is therefore entitled to summary judgment against Built-Well on this issue.

### 4. The NHC Lien Is Invalid Because of NHC's Failure to Comply with the Requirements of the Lien Statute

On or about June 2, 2008, NHC filed its Counterclaim and Cross Claim herein (the "NHC Counterclaim"). A copy of the lien filed by NHC against the Property (the "NHC Lien") is attached to the NHC Counterclaim as Exhibit E, and has also been attached to Chambers' Motion as Exhibit "V". The NHC Lien was recorded in the real estate records of Washington County,

Arkansas on August 24, 2007, at File Number L079-00000402.   An Affidavit of Notice is attached to and incorporated into the NHC Lien, but the Affidavit indicates that the notice requirements set forth in the Lien Statute "were waived and therefore deemed to have been complied with pursuant to the 'Conditional Lien Release and Lockbox Agreement' that is attached hereto as Exhibit '1' and incorporated by reference herein."   *See* NHC's Affidavit of Notice attached to the NHC Lien as Exhibit B.   No copies of any notice are attached to the Affidavit of Notice.  See NHC Lien, attached hereto as Exhibit V.  There has been no evidence presented herein that all of the Owners waived the right to receive statutorily required notice, and NHC has failed to provide proof that it served the Ten Day Notice or the Commercial Notice upon all of the Owners.

The evidence further indicates that the *only* notice that was allegedly sent by NHC was sent to Commerce Park and the Marinonis.  *See* notice allegedly sent by NHC, a true and correct copy of which is attached to Chambers' Motion as Exhibit "W".   NHC has provided no evidence that it sent the Commercial Notice to all the Owners.  This failure invalidates the NHC Lien.  *See Books-A-Million*, 340 Ark. at 472-73, 10 S.W.3d at 861.   In addition, the "Notice to Property Owner" contained within the NHC Notice is not set forth in boldface type as required by Ark. Code Ann. § 18-44-115(e)(2)(C)(v).[6]   *See* Exhibit W.   Because the Arkansas courts have mandated strict compliance with the requirements of the Lien Statute, even a minor defect such as this renders the NHC Notice insufficient and invalidates the NHC Lien.  *See Books-A-Million, supra.*

---

[6] The text "Notice to Property Owner" is set forth in boldface type, in all capital letters, and underlined in the NHC Notice, but the body of the Notice to Property Owner is not in boldface type.

Because of NHC's above-described failures to comply with the requirements of the Lien Statute, the NHC Lien is invalid.  No material issues of fact remain.  Accordingly, Chambers Bank is entitled to summary judgment on the issue of the invalidity of the NHC Lien.

5.   *The Johnson Lien Is Invalid Because of Johnson's Failure to Comply with the Requirements of the Lien Statute*

On or about November 2, 2007, Johnson filed its Answer to Cross-Claim of Professional Air Systems, Inc. and Cross-Claim herein ("Johnson's Cross-Claim").  A copy of the lien filed by Johnson against the Property (the "Johnson Lien") is attached to Johnson's Cross-Claim as Exhibit B, and has also been attached to Chambers' Motion as Exhibit "X".  The Johnson Lien was recorded in the real estate records of Washington County, Arkansas on August 2, 2007, at File Number L078-00000930.  An Affidavit of Notice is attached to and incorporated into the Johnson Lien, and a copy of the notice allegedly sent by Johnson to the Owners is attached as Exhibit A thereto (the "Johnson Notice").

The Johnson Lien is invalid because of Johnson's failure to verify service of the Johnson Ten Day Notice in accordance with Section 114.  As explained above, Section 114 requires that when service of the 10-day notice prescribed therein is accomplished by mail, the service must be verified by a return receipt signed by the addressee or the agent of the addressee, or by evidence of refusal of the notice.  *See* Ark. Code Ann. § 18-44-114(b)(2)(B).  No such verification was made in connection with the filing of the Johnson Lien.  Therefore, the Johnson Lien is invalid for failure to comply with the requirements of the Lien Statute.

In addition to the above, the Johnson Lien is invalid because it incorporates amounts due and outstanding to subcontractors.  In his deposition, Stan Johnson ("Mr. Johnson") indicated that a certain portion of his lien relates to amounts due and owing to subcontractors.  *See* Deposition of Stan Johnson, pertinent portions of which are attached to Chambers' Motion as

Exhibit "Y". Specifically Mr. Johnson was questioned about his lien claim: "[O]f the $102,924.00, how much is owed to [subcontractors]?" Exhibit Z, p. 60. In response, Mr. Johnson indicated that "[i]t's right at $48,000.000, but I'll—I'll give you the breakdown." *Id.* Mr. Johnson indicated that Johnson had a spreadsheet that would indicate the outstanding amounts that are included within the lien claim of Johnson. Despite request, the documentation has not yet been provided.

As can be seen above, the Johnson Lien includes amounts due and payable to subcontractors. As stated above, a materialman's lien claimant may not claim a lien for labor and materials provided by others, including subcontractors. Accordingly, even if Johnson's lien is not otherwise invalid, which Chambers Bank contends that it is, this Court should rule on partial summary judgment that Johnson Mechanical claim must be reduced by no less than $48,000.00 for labor and materials provided by subcontractors that it has admitted is incorporated within its lien claim.

Because of Johnson's above-described failure to comply with the requirements of the Lien Statute, the Johnson Lien is invalid. Chambers Bank is therefore entitled to summary judgment against Johnson on this issue.

6.  *The Kitchen Lien Is Invalid Because of Kitchen's Failure to Comply with the Requirements of the Lien Statute*

On or about March 31, 2008, Kitchen filed its Counterclaim and Cross-Claims Against Defendants and Third Party Defendants herein ("Kitchen's Counterclaim"). A copy of the lien filed by Kitchen against the Property (the "Kitchen Lien") is attached to Kitchen's Counterclaim as Exhibit A, and has also been attached to the Chambers' Motion as Exhibit "Z". The Kitchen Lien was recorded in the real estate records of Washington County, Arkansas on August 2, 2007, at File Number L078-00000929. An Affidavit of Notice is attached to and incorporated into the

Kitchen Lien, and a copy of the notice allegedly sent by Kitchen to the Owners is attached as Exhibit A thereto (the "Kitchen Notice").

The Kitchen Lien is invalid because of Kitchen's failure to verify service of the Kitchen Notice in accordance with Section 114. As explained above, Section 114 requires that when service of the Ten Day Notice prescribed therein is accomplished by mail, the service must be verified by a return receipt signed by the addressee or the agent of the addressee, or by evidence of refusal of the notice. *See* Ark. Code Ann. § 18-44-114(b)(2)(B). No such verification was made in connection with the filing of the Kitchen Lien. Therefore, the Kitchen Lien is invalid for failure to comply with the requirements of the Lien Statute.

Because of Kitchen's above-described failure to comply with the requirements of the Lien Statute, the Kitchen Lien is invalid. Chambers Bank is therefore entitled to summary judgment against Kitchen on this issue.

> 7. *The Vitro Lien Is Invalid Because of Vitro's Failure to Comply with the Requirements of the Lien Statute*

On August 6, 2007, Vitro filed its lien against the Property, which was recorded in the real estate records of Washington County, Arkansas at File Number L079-00000008 (the "Vitro Lien"). A true and correct copy of the Vitro Lien attached to Chambers' Motion as Exhibit "aa". An Affidavit of Notice is attached to the Vitro Lien, and a copy of the notice allegedly sent by Vitro to the Owners is attached as Exhibit A thereto (the "Vitro Notice"). Copies of certain return receipts are attached to the Affidavit of Notice as Exhibit B.

The Vitro Notice is insufficient to satisfy the requirements of the Lien Statute; therefore, the Vitro Lien is invalid. As explained above, proper statutory notice must be given to the owners of the property at issue in order for a potential lien claimant to perfect its lien. Section 115(e)(2) requires, *inter alia*, that notice given thereunder shall contain "[a] general description

of the labor, service, or materials furnished . . . ."  *See* Ark. Code Ann. § 18-44-115(e)(2)(C)(i). The Vitro Notice contains a statement that "[Vitro, d/b/a] Binswanger Glass provided labor, materials, equipment, and supplies used to construct improvements to the real property and commercial project known and referred to as Commerce Park II, 2049 E. Joyce Blvd., Fayetteville, Arkansas 72703."  However, the Vitro Notice does not contain any description of the labor, materials, equipment, or supplies furnished in connection with the Property.  *See* Vitro Notice attached to Exhibit aa as Exhibit A.  Because the Arkansas courts have mandated strict compliance with the requirements of the Lien Statute, the Vitro Notice is insufficient and the Vitro Lien is invalid.  *See Books-A-Million, Inc. v. Arkansas Painting and Specialties Co.,* 340 Ark. 467, 10 S.W.3d 857 (2000).

The Vitro Lien is also invalid because Vitro failed to properly affect service upon Next Chapter.  Specifically, the Ten Day notice was not served upon the registered agent of Next Chapter, Terry Turpin ("Mr. Turpin"), in contemplation with the statute.  As per the affidavit of Mr. Turpin, Mr. Turpin did not sign the return receipt related to Vitro's Ten Day Notice.  *See* Affidavit of Terry Turpin, a true and correct copy of which is attached to Chambers' Motion as Exhibit "bb".  Mr. Turpin has stated, in fact, that he is unsure whose signature appears upon the return receipt.  *See* Exhibit bb.  Thus, because Vitro failed to serve the Ten Day Notice upon the agent of one of the Owners, their respective lien claim is invalid as a matter of law.

As explained above, Section 114 requires that when service of the Ten Day Notice prescribed therein is accomplished by mail, the service must be verified by a return receipt signed by the addressee or the agent of the addressee, or by evidence of refusal of the notice.  *See* Ark. Code Ann. § 18-44-114(b)(2)(B).  Although Vitro attempted to verify service by attaching return receipts to the Affidavit of Notice filed with the Vitro Lien, the verification attempted by

Vitro was inadequate and not in compliance with the requirements of Section 114, because Vitro failed to properly serve Mr. Turpin. Therefore, the Vitro Lien was not properly perfected, and is invalid as a matter of law.

Because of Vitro's above-described failures to comply with the requirements of the Lien Statute, the Vitro Lien is invalid. Chambers Bank is therefore entitled to summary judgment against Vitro on this issue.

8. *Any Lien Filed by Mobley Is Subordinate to the Mortgage Interest of Chambers Bank*

On or about December 22, 2005, Mobley executed and delivered to Chambers Bank a Lien Waiver and Subordination Agreement (the "Subordination Agreement"), a true and correct copy of which is attached to Chambers' Motion as Exhibit "cc". Pursuant to the terms of the Subordination Agreement, Mobley irrevocably and unconditionally waived, relinquished, and released all right which Mobley had to claim a mechanics' or materialmen's lien against the Property to secure payment for labor and materials furnished by Mobley in connection with the Property on or before the date of the Subordination Agreement. *See* Exhibit cc, section 2, at p. 1. Pursuant to the Subordination Agreement, Mobley further agreed that any future right of Mobley to claim a mechanics' or materialmen's lien on the Property would be subject and subordinate to the lien of the Mortgage and any other documents entered into between Chambers Bank and the Owners relating to the Loan. *See* Exhibit cc, section 3, at pp. 1-2. Therefore, Chambers Bank is entitled to a finding that its Mortgage interest in the Property is superior to any lien filed by Mobley against the Property.

9. *Chambers Bank Reserves the Right to Argue Facts Related to the Invalidity of the Campbell Lien*

For reasons beyond the control of the parties, Chambers Bank has not yet been able to depose representatives of Campbell. Accordingly, and by agreement of Chambers Bank and Campbell, Chambers Bank reserves the right to supplement its Motion for Summary Judgment with respect to issues relating to the validity of the lien filed by Campbell on the Property.

## III. CONCLUSION

No genuine issue of material fact exists to be tried, and summary judgment in favor of Chambers Bank should be granted pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,

Jason N. Bramlett, AB # 2002140
Seth M. Haines, AB # 2004068
FRIDAY, ELDREDGE & CLARK, LLP
3425 North Futrall Drive
Fayetteville, Arkansas 72703-4811
Telephone: (479) 695-1107
Facsimile: (479) 695-2147

*Attorneys for Chambers Bank of North Arkansas*

By:/s/ Jason N. Bramlett
    Jason N. Bramlett, Ark. Bar # 2002140

## CERTIFICATE OF SERVICE

I, Jason N. Bramlett, hereby certify that a copy of the foregoing was served upon each party entitled to receive electronic notice via the CM/ECF on this 20th day of June, 2008:


/s/ Jason N. Bramlett _____